## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**JACQUELINE ANTONIA STEUTH**

     **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

Civ. No. 18-16220 (KM)

**OPINION**

<u>**KEVIN MCNULTY, U.S.D.J.**</u>:

     Plaintiff Jacqueline Antonia Steuth brings this action pursuant to 42 U.S.C. § 1383(c)(3) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. Steuth seeks to reverse the finding of the Administrative Law Judge ("ALJ") that she has not met the Social Security Act's definition of disabled since March 7, 2014, the alleged disability-onset date.

     The question is whether the ALJ's decision is supported by substantial evidence. Specifically, Steuth contends that the evidence does not support the ALJ's (1) finding as to her residual functional capacity ("RFC"); and (2) decision that the Commissioner met the burden of proof at Step Five of the Sequential Evaluation Process in determining that there were a significant number of jobs existing in the national economy that Steuth was able to perform.

     For the reasons stated below, the decision of the ALJ is **AFFIRMED**.

## I. BACKGROUND[1]

On April 2, 2014, Steuth filed an application for SSI under Title XVI of the Social Security Act asserting that she was disabled as of January 1, 2012. (R. 288). Her application was initially denied on June 20, 2014 (R. 118) and upon reconsideration on November 12, 2014 (R. 125).

On September 20, 2016, Steuth, represented by an attorney, appeared and testified before the ALJ. (R. 65, 67-87). Another hearing was held on November 22, 2016. (R. 36). The ALJ heard testimony from Jay Steinbrenner, a vocational expert ("VE"). (R.36, 40-64). After the hearings, Steuth submitted additional evidence, which the ALJ considered before rendering a decision. (R. 15).

On July 28, 2017, the ALJ issued a decision finding that Steuth was not disabled within the meaning of the Social Security Act. (R. 12-30). The ALJ determined that Steuth's impairments, specifically internal derangement of the knee, major depressive disorder, and generalized anxiety disorder, were severe, but not of listing-level severity. (R. 18-20). She concluded that Steuth, given her RFC, was able to perform work existing in significant numbers in the national economy. (R. 29-30).

## I. Standard

To qualify for SSI, a claimant must meet income and resource limitations, and show that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

---

[1]   Citations to the record are abbreviated as follows:

| "DE __" | = | Docket entry in this case; |
| "DE 26" | = | Steuth's brief; |
| "DE 28" | = | The Commissioner's brief; |
| "R. __" | = | Administrative Record (DE 12) (page numbers refer to the page numbers in the lower-right corner of the page—not the ECF docket page numbers). |

U.S.C. § 1383c(a)(3)(A). A person is deemed unable to engage in substantial gainful activity

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

### A. The Five-Step Process and This Court's Standard of Review

Under the authority of the Social Security Act, the Administration has established a five-step evaluation process for determining whether a claimant is disabled and entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step One:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If yes, the claimant is not disabled. If not, move to step two.

**Step Two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. If the claimant has a severe impairment, move to step three.

**Step Three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, subpt. P, app. 1, Pt. A. (Those Part A criteria are purposely set at a high level to identify clear cases of disability without further analysis). If so, the

claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step Four:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If yes, the claimant is not disabled. If not, move to step five.

**Step Five:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610-11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder."). This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's

decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865-66 (3d Cir. 2007).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221-22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000).

### B. The ALJ's Decision

The ALJ followed the five-step process in determining that Steuth was not disabled. The ALJ's findings may be summarized as follows:

**Step One:** At step one, the ALJ determined that Steuth had not engaged in substantial gainful activity since March 7, 2014, the application date.[2] (R. 17).

---

[2] There appears to be some confusion as to the disability onset date. Steuth's application summary lists January 1, 2012 as the onset date. (R. 288). However, the ALJ's opinion states that the application was filed March 7, 2014 (R. 15) and concludes that Steuth has not been under a disability since March 7, 2014, "the date the application was filed." (R. 30). Both the application summary included in the administrative record and Steuth's brief state that the application was filed April 2, 2014. (R. 288; DE 26 at 1).

During the November 22, 2016 hearing, the ALJ had the following exchange with Steuth's attorney:

ALJ: I had asked for [medical records] from the alleged onset date. It looks like it's just from January of 2016.

Atty: I think it's the SSI application, right?

ALJ: The SSI application was filed in March 2014.

Atty: So that's the onset, isn't it?

(R. 38).

Ultimately, this discrepancy is immaterial to this appeal. Steuth has not alleged that the ALJ was mistaken in the conclusion that the onset date was March 7, 2014 and her appeal papers seem to adopt this date. At any rate, the medical evidence analyzed by the ALJ dates to 2012 and before.

**Step Two:** At step two, the ALJ determined that Steuth had the following severe impairments: internal derangement of the knee, not otherwise specified; major depressive disorder; and generalized anxiety disorder. (R. 18).

**Step Three:** At step three, the ALJ determined that Steuth did not have an impairment, or combination of impairments, that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 19-20).

There was no accepted medical source in the record that supported a finding that Steuth's impairments met or medically equaled any physical or mental impairment. (R. 19). The ALJ determined that "no treating or examining physician has mentioned findings equivalent in severity" to the listings 1.02, 12.04, and 12.06. (*Id.*).

The ALJ gave particular attention to listing 1.02 for major dysfunction of a joint. (*Id.*). The ALJ noted that the listing required a resulting inability to ambulate effectively, and the medical evidence did not indicate that she could not do so. (*Id.*).

Under Listings 12.04 and 12.06 for mental disorders, the ALJ concluded that Steuth's impairments did not cause at least two "marked" limitations, or one "extreme" limitation, under the Paragraph B criteria for mental functioning. (*Id.*). To satisfy the Paragraph B criteria, a claimant's mental disorder must result in an extreme limitation of one, or a marked limitation of two, of the four Paragraph B areas of mental functioning.

Of the four areas evaluated for mental functioning, the ALJ found that Steuth had moderate difficulty in all four: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself. (R. 19-20).

**Step Four:** At step four, the ALJ determined that Steuth had the RFC to perform light work, except that she could not use foot control. (R. 20). The ALJ found that Steuth could "occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds." (R. 20-21). She could "occasionally balance or stoop, but never kneel, crouch, or crawl" and "squat up to one quarter of the

6

way." (*Id.*). The AJ concluded that she was limited to unskilled work with only occasional decision making or changes in the work setting, and would be off task up to ten percent of the day. (R.21).

The ALJ also determined that Steuth did not have past relevant work. (R. 29).

**Step Five:** At step five, the ALJ considered Steuth's age, education, work experience and RFC in conjunction with the Medical-Vocational Guidelines. (R. 29). Relying on the testimony of the VE, the ALJ identified several representative jobs that Steuth could perform: (1) Cashier II (Director of Occupational Titles ("DOT") #211.462-010); Small products assembler (DOT #706.684-022); and Plastic injection molder (DOT #556.685-038). (R. 29-30). The ALJ also determined, based on expert's testimony, that a significant number of these jobs were available nationally. (R. 30).

Accordingly, the ALJ determined that Steuth was not under a disability, as defined in the Social Security Act, since March 7, 2014. (*Id.*).

## II.    Discussion

Steuth argues that the ALJ erred in establishing her physical and mental RFC, including determining the RFCs without sound evidentiary basis and failing to credit certain impairments as "severe." She further argues that the ALJ did not satisfy her Step Five burden because she improperly relied on VE testimony which deviated from administrative guidance.

### A. Error in determining Steuth's RFC

Steuth's argument centers on the contention that the ALJ failed to properly evaluate and credit medical opinions.

Under 20 C.F.R. § 416.927(c), ALJs are required to weigh and evaluate "every medical opinion." Medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

20 C.F.R. § 404.1502 lists the "acceptable medical sources" that can provide evidence to establish an impairment. "Treating source means [an] acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.927(a)(2) (alterations added). Controlling weight can be given to "a treating source's medical opinion on the issue(s) of the nature and severity" of the claimant's impairments if the medical opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2).

"[A] reviewing court should not re-weigh the medical opinions of record but should consider only whether the ALJ's weighing of such opinions was supported by substantial evidence." *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) (citing *Monsour Med. Ctr. v. Heckler*, 806 F.3d 1185, 1190 (3d Cir. 1986)). "The ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)).

When an ALJ totally rejects a medical opinion, he or she is required to point to "contradictory medical evidence." *Cunningham v. Comm'r of Soc. Sec.*, 507 Fed. App'x 111, 118 (3d Cir. 2012). Where, as here, the ALJ is discounting, rather than rejecting, opinion evidence, he or she must "consider all the evidence and give some reason for discounting the evidence." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

1) *Failure to classify certain impairments as severe*

Steuth first argues that the ALJ disregarded several of her medical ailments in outlining which impairments were severe. Specifically, she calls attention to the presence of diabetes mellitus, fatty liver infiltration, esophagitis, and goiter. Steuth contends that the medical evidence for these ailments was not refuted and should therefore have supported a finding of

severity. With respect to diabetes mellitus, she argues that the stability of an impairment does not lessen its severity.

The ALJ considered all of these ailments. (R. 18). The record does not show that Steuth had sought any sort of follow-up treatment for either the goiter or the mild fatty liver infiltration. (*Id.*). Regarding diabetes mellitus and esophagitis, the ALJ found that the record showed that those "conditions are capable of being managed medically, and are amenable to proper control by adherence to recommended medical management and medication compliance." (*Id.*). To support this conclusion, the ALJ noted that Steuth reported she was tolerating a drug prescribed for diabetes treatment well and did not show several symptoms associated with the illness. (*Id.*). Regarding hyperlipidemia and esophagitis, the ALJ noted that Steuth did not seek or require treatments from specialists. (*Id.*).

Steuth argues that just because a condition may be stable does not mean that it is not severe. That is true as far as it goes; to be missing a limb, for example, is surely a "stable" condition, but no less severe for that. Even so, there was no evidence in the record that suggested diabetes was significantly affecting Ms. Steuth, whether or not the condition was stable. The ALJ did not discard or fail to credit medical opinions on the severity of these ailments— none were provided. The ALJ's decision not to classify these impairments as severe was therefore supported by substantial evidence.

*2) RFC determination: Physical component*

With respect to the knee impairments which comprise her physical RFC, Steuth claims that the ALJ did not state the reasoning for assigning an RFC for the full exertional range of light work. The ALJ did not adopt the state medical consultants' opinion that Steuth be limited to no more than four hours standing and walking in an eight hour workday. Rather, Steuth argues, the ALJ inserted her own unfounded opinion that she could in fact spend six hours standing in the work day.

I find that the ALJ's determination of the physical RFC was supported by substantial evidence. The ALJ determined that Steuth could handle "light work." This exertional range is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Steuth presumably draws the six hour figure from case law explicating the "light work" physical RFC. *See Fargnoli v. Massanari*, 247 F. 3d 34, 40 (3d Cir. 2001) (quoting *Jesurum v. Sec. of Health & Human Servs.*, 48 F. 3d 114, 119 (3d Cir. 1995) ("The SSA has further explained that 'light work generally requires the ability to stand and carry weight for approximately six hours of an eight hour day.'")).

The ALJ offered the following explanation of why she dispensed with the state medical consultants' four-hour recommendation:

> Finally, State agency medical consultant Zwi Kahanowicz, M.D., reviewed the claimant's file in June 2014, and opined she could perform work at the light exertional level, but with standing and/or walking for 4 hours, frequently climbing ramps, stairs, ladders, ropes, or scaffolds, balancing, and stooping, and occasionally kneeling, crouching, and crawling. Upon reconsideration, State agency medical consultant Arvind Chopra, M.D., reviewed the claimant's file in September 2014 and affirmed Dr. Zahanowicz's opinions. The undersigned gives some weight to the State agency medical consultants' opinions. While they also did not examine or treat the claimant, their opinions are consistent with the few examinations in the record showing abnormalities such as a positive right anterior drawer and moderate crepitus and decreased range of motion in the claimant's right knee. *However, the undersigned finds that their opinion limiting the cla[i]mant to standing and/or walking 4 hours is inconsistent with the multiple*

> *normal physical examinations throughout the period in question, and the claimant's lack of complaints and limited treatment regarding her right knee.*

(R. 27) (citations omitted) (emphasis added).

Steuth argues that the ALJ does not explain how the 4 hour limitation is "inconsistent." But the ALJ cited amply to evidence from physicians who had treated or opined on Steuth's physical condition. For example, the ALJ cited records of physical examinations with Dr. Neno, Steuth's treating physician. (R. 22).

The records from Dr. Neno do not indicate any disabling knee issues. The ALJ reviewed medical records from Dr. Neno dating back to 2011. A visit on July 8, 2011 revealed knee pain as well as internal damage. (R. 457-458). Dr. Neno recommended she visit an orthopedist. (R. 459). During her next visit on December 2, 2011, Steuth reported that she had not seen an orthopedist, but that her knee was a little better. (R. 460). She again complained of knee pain on June 1, 2012 and was diagnosed with internal derangement of the knee, not otherwise specified. (R. 465). She complained of knee pain on her next visit, but no action was recommended. (R. 470). A month later, she did not mention knee pain during the physical examination. (R. 473).

At a November 16, 2015 visit, Steuth was again complaining of right knee pain. (R. 540). On that visit, Dr. Neno reported that Steuth had "better quality of life due to pain meds" which she had been prescribed. (R. 542). But while Steuth did complain of "her usual chronic right knee pain" on March 28, 2014 (R. 555), she did not complain of knee pain during March 23, 2015 and September 15, 2014 visits (R. 550; 553).

All this evidence suggests that Steuth was experiencing knee pain, but, as the ALJ concluded, "[t]he normal findings upon physical examination are inconsistent with the claimant's allegations of a disabling level of symptoms and limitations as a result of her knee impairment." (R. 22).

The ALJ also reviewed an orthopedic consultative examination that Steuth underwent in August 2012 with Dr. Kern. (R. 22-23). At the

consultation, Steuth stated that she had injured her knee following a slip and fall around 2009. (R. 399). This report, echoing Dr. Neno's analysis of her treatment with pain medication, stated that she took "Relafen as needed" and was "in no significant distress due to her pain." (R. 400). The report stated that Steuth exhibited no gait asymmetry and was able to perform a full squat without significant difficulty. (*Id.*). Dr. Kern continued that Steuth "ambulates without assistive device for unlimited distances including a 23-block to her friend's house." (*Id.*).

The ALJ also reviewed records of a second orthopedic consultative examination in May 2014 with Dr. Fusman. (R. 23-24). Dr. Fusman noted that Steuth's range of motion was decreased in her right knee and that she had difficulty walking on her heels and toes on the right leg. (R. 507-508). He stated that she could squat a quarter way down and had an antalgic gait with pain in the right knee when she ambulates. (R.508).

In addition to the medical records, the ALJ considered opinions by various physicians. (R. 25-27). Dr. Kern opined that Steuth "has unlimited walking, standing, and sitting tolerance." (R. 401). The ALJ gave "some weight" to these opinions because they were "consistent with the numerous normal examinations the claimant underwent with Dr. Neno throughout the relevant time." (R. 25). Dr. Fusman opined that Steuth had a moderately limited ability to walk and stand. (R. 508). The ALJ gave "little weight" to his findings, because they were inconsistent with Steuth's "normal physical examinations that did not show a gait or extremity abnormality" as well as "the limited treatment the claimant received for her right knee" and her "rare complaints of pain." (R. 26-27).

Ultimately, the ALJ gave greater weight to Steuth's "lack of complaints and limited treatment regarding her right knee" than to the opinion evidence of Dr. Fusman and the state medical consultants. The ALJ was entitled to do so, given that there was substantial evidence of the limited impact of Steuth's knee impairment, including examinations by Dr. Neno and Dr. Kern. As for arriving at the six-hour (light exertion) figure, the ALJ was entitled to come to this RFC

conclusion without a specific recommendation that she do so. *See Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties.").

Having reviewed the record and the ALJ's decision, I find that the physical RFC was supported by substantial evidence.

*3) Mental RFC*

Steuth next claims that the ALJ's determination of her mental RFC contains no meaningful limitations in spite of the evidence suggesting disability. She suggests that the only limitation is the ALJ's finding that she would be ten percent off-task.

However, Steuth's analysis of the mental RFC is incorrect. The ALJ did in fact establish a substantive mental RFC which did not merely recited the ten percent off-task limitation, but others as well, in recognition of her impairments: "She is limited to unskilled work. She is limited to only occasional decision making and only occasional changes in the work setting. She will be off task up to 10 percent of the day." (R. 21).

Steuth claims that this does not go far enough to accommodate the impairments which the ALJ found to be moderate. It is true that the ALJ found she had moderate limitations in concentrating, persisting, or maintaining pace, which is relevant to the percentage of time she might be off-task. But the resulting limitation of unskilled work limited to occasional decision making sufficiently takes that limitation into account. *See Menkes v. Astrue*, 262 F. App'x 410, 412 (noting that including a limitation of "simple routine tasks" in a hypothetical question to a VE took into account a claimant's moderate limitations in concentration, persistence, and pace.").

Steuth further argues that the limitation of "unskilled work" is illusory since, as a result of her educational background, she was already limited to unskilled work. The conclusion does not follow; that she was confined to unskilled work as a practical matter does not imply that her moderate

impairments necessarily require a further limitation. Moreover, she was granted the additional restrictions of occasional decision-making and change in work setting.

These arguments are based only on Steuth's feeling that the reality of living with moderate limitations renders the RFC insufficient. But she provides no legal basis for this claim.

Finally, Steuth argues that the ALJ impermissibly disregarded the opinion of her treating psychiatrist, Dr. D'Amato, in determining her RFC. Dr. D'Amato opined in October of 2015 that Steuth had little to no ability to function in a workplace environment. (R. 523-525).

Steuth correctly notes that the opinion of a treating physician ought to be considered and given substantial weight. *See Johnson* ("[O]pinions of a claimant's treating physician are entitled to substantial and at times even controlling weight. However, the treating source's opinion is entitled to controlling weight only when it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record.") (quotations omitted).

However, the ALJ explained in detail why she gave little weight to Dr. D'Amato's opinion. (R. 26). First, it "was inconsistent with his treatment notes which often indicated the claimant was doing well." (*Id.*; 636, 640). Second, it was inconsistent with the findings of the psychological consultative examiner. (*Id.*). This examiner, Dr. Candela, noted that Steuth was responding well to medication prescribed by Dr. D'Amato and did not diagnose her with any issues. (R. 513-514). Third, Dr. D'Amato's opinion conflicted with Steuth's own testimony regarding her daily activities, which included caring for her young daughter. (R. 26). Finally, although Dr. D'Amato reported in his treatment notes that the patient was not experiencing side effects from medication (R. 521, R. 529), he explained that side effects from the medication were part of the reason she was unable to work. (R. 525).

The ALJ gave sufficient reasons for her decision to afford little weight to Dr. D'Amato's opinion. Ultimately, the ALJ did not discount his opinion

altogether. In crafting the mental RFC, the ALJ incorporated "the few abnormal findings upon examination with Dr. D'Amato" and limited Steuth to unskilled work with occasional decision making, changes in the work setting, and time off-task. (R. 25).

Given the specific reasons justified by the record, I find that the ALJ's determination of Steuth's mental RFC was backed by substantial evidence.

## B. Use of VE Testimony in Step Five determination

Steuth argues that the ALJ did not have substantial evidence for her Step Five finding because testimony from the VE deviated from information in the Dictionary of Occupational Titles ("DOT"). She claims that the three potential jobs that the VE suggested would fit her hypothetical requirements in fact would require more than four hours sitting and standing. The ALJ decided otherwise, she claims, because of anecdotal testimony from the VE that those jobs "usually" would have a stool so the worker could sit down intermittently.

However, Steuth's argument is misguided. In another guise, she is arguing that the ALJ should have included a four-hour limitation of sitting or standing in her RFC. I have already dealt with that argument above. Whether someone with an RFC allowing four hours of sitting or standing could perform the suggested jobs is irrelevant—Steuth's RFC does not include that limitation.

The ALJ asked the VE the following hypothetical:

> "[A]ssume a hypothetical claimant with [Steuth's] vocational factors who can do light work; no foot control; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing or stooping; never kneeling, crouching, or crawling; squatting up to one quarter of the way; and standing or walking up to four hours in a day and sitting up to six hours in a day; unskilled work; and ask were there any jobs such a hypothetical claimant can perform?

(R. 42).

Given that hypothetical, the VE responded with the three potential jobs that Steuth was determined to be qualified for. (R. 42-43). Steuth's attorney then asked the VE what his basis was for coming up with these potential jobs, given that the hypothetical of standing and walking four hours instead of six

hours was a deviation from the DOT descriptions for those jobs. (R. 44). The VE responded that the basis was his 36 years of working in vocational rehabilitation. (*Id.*). He went on to describe more specifically how his experience evaluating workspaces led him to that conclusion. (R. 51-57).

Then, the ALJ asked him to specify further about how typical the presence of a stool was:

> ALJ: You know, let me ask you something, Mr. Steinbrenner. You mentioned the word an accommodation by the employer. Is that an accommodation—in other words, I was under the impression that cashier II, I was under the impression, is a job that you could do seated or standing and had that option. I didn't think there was an accommodation that was required for that.

> VE: Well, you know, I've run into this both ways where the person was hired and it never came into question because when they were shown their workstation, the stool is already there.

> [...]

> ALJ: But in your experience, the job of cashier II—based upon your experience, do you think that most cashier II's would be able to do this job if they were only standing up to four hours a day, standing—

> VE: I do.

(R. 57-58).

Although the VE offered additional opinion evidence that that a person with a four-hour standing limitation could perform those jobs, such evidence was not necessary. The ALJ, in effect, presented the VE with multiple hypotheticals, a common practice. On hypothetical posited a RFC that was more restrictive than what she ultimately determined Steuth's RFC to be. It follows, *a fortiori*, that someone with a less restrictive RFC could perform those jobs effectively.

Even if Steuth's RFC had matched the hypothetical, the VE backed up his opinion with specific examples drawn out of his professional experience. This was substantial evidence on which the ALJ was entitled to base her opinion. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019) ("[A] vocational expert's testimony may count as substantial evidence even when

unaccompanied by supporting data."). Therefore, the ALJ was entitled to hold that the VE's testimony warranted a deviation from DOT description, even though this deviation did not affect the outcome of the determination.

Accordingly, I find that the ALJ based Steuth's Step Five determination on substantial evidence.

## III.    Conclusion

For the foregoing reasons, the ALJ's decision is affirmed. An appropriate order accompanies this Opinion.

Dated: March 30, 2020

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**